## J. W. KELLY & CO. v. STATE.*

### (Knoxville.   September Term, 1910.)

1. **STATUTES.** Legislative intent is to be ascertained from the statute itself in connection with other statutes on the same subject, and not from strict and accurate definition of words.

In the construction of a statute, the inquiry is not what is the strict and accurate definition of words according to accepted usage and the approved authority of the lexicographers, but the sole question is what was the legislative intent, which must be ascertained from an examination of the statute itself, in connection with other statutes in *pari materia*, and in the light of the history of the system of legislation of which it is a part. (*Post, pp.* 527, 528.)

2. **SAME.** All beverage sales of intoxicating liquors are prohibited; general and promiscuous sales in whoesale quantities by manufacturers to dealers that may finally reach the consumer are beverage sales; word "sale," "tipple," and "or" defined.

In view of the prior legislation prohibiting and regulating the sale of intoxicating liquors, the word "sale" in the title of the statute (Acts 1909, ch. 1), expressing the subject of legislation as the prohibition of the "sale" of intoxicating liquors as a beverage near any schoolhouse, where school is kept, whether the school be in session or not, is used in its common and ordinary sense, and includes all sales except nonbeverage sales, without regard to their form or character; and the word "tipple," used in the first section of the body of the statute, declaring it unlawful "to sell or tipple" any intoxicating liquors as a beverage within four miles of such schoolhouse; denotes a subdivision of the more comprehensive term "sale," as used in the title, and its equivalent "to sell," as used in the body; and the conjunction "or" connecting the words "sell" and "tipple" is used in a disjunctive sense, and the prohibition is not against tippling sales alone, but against any other sales as well; and the words "as a beverage," as used in said title and first section, do not restrict

---

*As to constitutional right to prohibit sale of intoxicating liquor, see note to State v. Durein (Kan.), 15 L. R. A. (N. S.), 908.

Kelly v. State.

the word "sale" so as to confine the prohibition to sales for consumption by the immediate purchaser, but the prohibition extends to all sales of intoxicating liquor to be finally used, when it reaches the consumer, as a beverage, so that a sale of intoxicating liquors, in wholesale quantities, by a manufacturer thereof to a wholesaler, with only a general and promiscuous purpose, includes or constitutes a beverage sale, within the prohibition of the said statute.    (*Post, pp.* 525-544, *and especially pp.* 536-538, 549, 550.)

Code cited and construed:   Secs. 2567, 6780 (S.); secs. 2011, 5667 (M. & V.); secs. 1512, 4857 (T. & S. and 1858).

Acts cited and construed:   Acts 1909, ch. 1, in connection with previous Acts 1868-69, ch. 45, secs. 5 and 18; Acts 1870, ch. 51; Acts 1877, ch. 23; Acts 1887, ch. 167; Acts 1899, ch. 221; Acts 1903, ch. 2; Acts 1905, ch. 422; Acts 1907, ch. 17; Acts 1909, chs. 14 and 479.

Cases cited and approved:   State v. Odam, 2 Lea, 221; State v. Staley, 3 Lea, 566; Dodson v. State, 5 Lea, 274; Harney v. State, 8 Lea, 114; Lea v. State, 10 Lea, 480; State v. Lowenhaught, 11 Lea, 13; State v. Tarver, 11 Lea, 658; Harrison v. State, 96 Tenn., 548; Kidd v. Pearson, 128 U. S., 1-19.

3.  **INTOXICATING LIQUORS.**   **Proof of sale shifts burden to defendant to prove that sale was not as a beverage; sale by wholesale does not negative a sale as a beverge.**

Proof of the sale of intoxicating liquors by a defendant under indictment for selling such liquors within four miles of a schoolhouse where a school was kept, which is within the prohibition of Acts 1909, ch. 1, if the liquor was sold as a beverage, shifts the burden to the defendant to prove that the sale was not as a beverage, but for some other lawful purpose; and the fact that the sale was by wholesale or in a large quantity to be distributed by the buyer to the public generally for all purposes does not negative a purpose on the part of such seller that it was sold as a beverage.    (*Post, p.* 540.)

Acts cited and construed:   Acts 1909, ch. 1.

Kelly v. State.

4. **STATUTES.** Exception indicates that the subject thereof would be included within the general provision but for the exception; debates and circumstances in passage of law as to its construction.

The general rule for the construction of statutes is that the exception indicates the extent of the general provision, and proves that, in the opinion of the legislature, the thing excepted would be within the general clause, had the exception not been made; and where the first section of a statute (as Acts 1877, ch. 23 and Acts 1887, ch. 167) declares that it shall be unlawful to sell or tipple intoxicating liquors within certain territory, and the second section of the same statute declares that the statute shall not apply to sales by manufacturers of such liquors in wholesale quantities, the said exception in such second section indicates that all other sales are within the prohibition of the first section, and that such sale by the manufacturer would be within such prohibition, if it were not for the exception; and it would require the strongest showing in the debates at the time the act was passed, and in the circumstances surrounding its passage, to induce the court to hold that the exception was introduced merely as a result of overcaution. (*Post, pp.* 540-543.)

Acts cited and construed: Acts 1877, ch. 23, secs. 1 and 2; Acts. 1887, ch. 167, secs. 1 and 2.

Cases cited and approved: Gibbon v. Ogden, 22 U. S., 191; Brown v. Maryland, 25 U. S., 419.

5. **CONSTITUTIONAL LAW.** Exception in favor of sales by manufacturers of intoxicating liquors against wholesale dealers who are not manufacturers is natural, reasonable, and just, and not arbitrary.

Acts 1887, ch. 167, is not unconstitutional, because its first section prohibits the sale of intoxicating liquors, in both retail and wholesale quantities, within four miles of a schoolhouse; and its second section makes an exception in favor of sales in wholesale quantities or packages by the manufacturer, upon the ground that the distinction in favor of the manufacturers and

Kelly v. State.

against the wholesale dealers who are not manufacturers is unreasonable and arbitrary; for the distinction is natural, reasonable, and just, in view of the nature of the two occupations, and of the further exception in favor of all sales within the limits of any incorporated town.  (*Post, pp.* 523, 544-546.)

Acts cited and construed:  Acts 1887, ch. 167, secs. 1 and 2.

6.  SAME.  "Near" in the title of a statute warrants the distance of four miles in its body prohibiting the sale of intoxicating liquors.

The statute (Acts 1909, ch. 1) prohibiting the sale of intoxicating liquors is not unconstitutional upon the ground that its body is broader than its title, in this that its title expresses the subject of legislation as the prohibition of the sale of intoxicating liquors as a beverage near any schoolhouse, where a school is kept, whether it be in session or not, and its body prohibits such sales within four miles of such a schoolhouse, especially since the legislative definition of four miles has been repeatedly given to the word "near" by such provisions made under a like title; for the word "near" is a relative term, with a variable meaning, the proper import of which is dependent upon the sense and connection in which it is used, considered together with the purpose to be accomplished.  (*Post, pp.* 522, 546-549.)

Acts cited and construed:  Acts 1909, ch. 1.

Constitution cited and construed:  Art. 2, sec. 17.

Case cited and approved:  Hadley v. Turnpike Co., 2 Humph., 555.

7.  SAME.  Statute prohibiting wholesale sales of intoxicating liquors is not unconstitutional as being broader than its title limited to beverage sales; beverage and nonbeverage sales stated.

A statute (Acts 1909, ch. 1) whose title limits the scope of legislation to the prohibition of the sale of intoxicating liquors as a beverage is not unconstitutional upon the ground that its body is broader than its title, where the provision in its body is construed to prohibit sales in wholesale quantities, because such

Kelly v. State.

liquors so sold may be intended for ultimate consumption as a beverage. Sales of intoxicating liquors made by druggists upon the prescription of a physician, sales for mechanical, medical, sacramental, chemical, scientific, and like purposes are nonbeverage sales, and all other sales are beverage sales. (*Post, pp.* 522, 546-550.)

Constitution cited and construed: Art. 2, sec. 17.

8. **SAME. Act not appearing or purporting to be an amendatory act is not required to recite the title or substance of the law amended.**

The statute (Acts 1909, ch. 1), prohibiting the sale of intoxicating liquor, as a beverage within four miles of any schoolhouse, is not an amendatory act, requiring the recital of the title or substance of the law sought to be amended; for it does not appear or purport to be an amendatory act, but is of and within itself a complete treatment of the subject of legislation with which it deals. (*Post, pp.* 522, 546, 550, 551.)

Acts cited and construed: Acts 1909, ch. 1.

Constitution cited and construed: Act 2, sec. 17.

Cases cited and approved: Terrell v. State, 86 Tenn., 523; Zickler v. Bank, 104 Tenn., 277; State, ex rel., v. Taylor, 119 Tenn., 253, 254.

9. **SAME. Only citizens affected by a statute can attack its constitutionality upon the ground that it takes property without compensation or due process of law.**

A manufacturer of intoxicating liquors indicted and prosecuted for selling such liquors, within four miles of a schoolhouse where a school was kept, in violation of the statute (Acts 1909, ch. 1) prohibiting such sales, as a beverage, is not in a position to attack the statute as unconstitutional upon the ground that it takes property without compensation and without due process of law, where the statute allows more than five months between the time of its passage and the time of its going into effect to dispose of the liquors on hand, which time is presumed to be

Kelly v. State.

ample time for that purpose, and where it is not shown that the liquor so sold was on hand when the law was passed, or what particular efforts were made to dispose of that on hand, or how much was disposed of; and the testimony of the president of the defendant corporation, given in response to a very leading question, that it had made every effort to dispose of its liquors at a fair price is not sufficient to show the required efforts. (*Post, pp.* 546, 551-555.)

Acts cited and construed:  Acts 1909, ch. 1.

Constitution of the State cited and construed:  Art. 1, secs. 8 and 21.

Constitution of the United States cited and construed:  5th and 14th ams.

Cases cited and approved:  State v. Burgoyne, 7 Lea, 173.

FROM HAMILTON.

Appeal in error from the Criminal Court of Hamilton County . S. E. McREYNOLDS, Judge.

SPEARS & LYNCH, LEWIS M. COLEMAN, and WILLIAMS & LANCASTER, for Kelly.

ATTORNEY-GENERAL CATES, for State.

MR. JUSTICE LANSDEN delivered the opinion of the Court.

The plaintiff in error, a corporation, was indicted in the criminal court of Hamilton county for that it "did

unlawfully sell as a beverage in wholesale quantities spirituous, vinous, malt, alcoholic, and intoxicating liquor within four miles of a school house where a school was kept," and, upon trial, was convicted, and a fine of $50 was assessed against it, from which it has appealed to this court.

In the court below plaintiff in error moved to quash the indictment upon the following grounds:

"(1) Because there is no law in this State which forbids or makes unlawful the sale of liquors or beer in wholesale quantities, as charged in the indictment in this cause, and no act of the general assmbly of this State purporting to forbid such sales.

"(2) Because the four-mile Act of 1909, being chapter 1 of the Acts of the Fifty-Sixth general assembly of the State of Tennessee, and being the act which it is insisted by the State that the defendant had violated, is in violation of article 2, sec. 17, of the constitution of Tennessee: (a) In that the prohibition of the sale of liquor within four miles of a schoolhouse was not embraced in the title, which prohibits a sale near any schoolhouse; (b) in that the wholesaling of liquor is not a sale as a beverage, and therefore not expressed in the title; and (c) in that it is in violation of that part of the above section of article 2 of the constitution of the State of Tennessee, to the effect that all acts which repeal, revive, or amend former laws shall recite in their caption or otherwise the title or substance of the laws repealed, revived, or amended.

"(3) Because, if said act should be construed so as to prohibit the sale of liquors in wholesale quantities, then it violates article 1, sec. 8, of the constitution of the State of Tennessee, and is void. And also violates article 1, sec. 21,of the constitution of Tennessee, and the fifth amendment to the constitution of the United States.

"(4) Because, if said act should be construed so as to prohibit the sale of liquors in wholesale quantities, then it violates the 'due process of law' clause of the fourteenth amendment to the constitution of the United States, and is void."

This motion was overruled, and defendant was placed upon trial its plea of not guilty. Upon the trial defendant admitted the sale as charged, but did not admit that it made the sale "as a beverage." The proof shows that defendant is a distiller, and has been for many years, and in connection with its business as distiller it sells by wholesale its own brands of whisky and such other brand as may be demanded by its trade. The sale in question was a sale of ten barrels of "Deep Spring" whisky manufactured by defendant and sold to Wakeman Distilling Company, a corporation, engaged in the wholesale whisky business, and also a distiller; but at the time of this sale its distillery was closed.

The purchaser testified that the sale in question was made to be resold in quantities of five gallons or more, and that it was so sold.

After judgment of conviction by the court, defendant moved for a new trial, assigning as causes therefor the

reasons embodied in its motion to quash the indictment with the added ground that the court erred in overruling its motion to quash. There was no exception in the court below that the conviction was not supported by the evidence.

The statute under which this conviction was had is as follows:

"An act to prohibit the sale of intoxicating liquors as a beverage near any schoolhouse, public or private, where a school is kept, whether the school be in session or not.

"Section 1. Be it enacted by the general assembly of the State of Tennessee, that it shall not hereafter be lawful for any person to sell or tipple any intoxicating liquors, including wine, ale, and beer, as a beverage, within four miles of any schoolhouse, public or private, where a school is kept, whether the school be then in session or not, in this State, and that any one violating the provision of this act shall be guilty of a misdemeanor, and, upon conviction, shall be punished by fine for each offense of not less than $50 nor more than $500, and imprisoned for a period of not less than thirty days nor more than six months.

"Sec. 2. Be it further enacted, that the grand juries shall have and exercise inquisitorial power in respect to violations of this act, and it shall be the duty of the circuit and criminal judges of the State to give the same in charge to them.

"Sec. 3. Be it further enacted, that all laws in conflict with this act be, and the same are hereby repealed.

"Sec. 4. Be it further enacted, that this act take effect from and after July 1, 1909, the public welfare requiring it."

Laws 1909, c. 1.

There are two questions made in this court against the conviction of defendant which may be generally stated as follows:

1 (a) The natural and proper, as well as the legal, meaning of this statute, does not include a wholesale sale between two corporations engaged in the wholesale business only, because the thing forbidden by the express terms of the statute is to "sell or tipple" intoxicating liquors "as a beverage;" that to "sell or tipple," as used in the statute, means to tipple only; and that as the sale was made to a corporation for the purpose of resale in wholesale quantities, it could not have been sold "as a beverage."

(b) If this were not true as an original proposition, the terms to "sell or tipple" had acquired a fixed and definite meaning in the whisky statutes of this State by construction by this court of the same words used in the four-mile law of 1877 and 1887; and therefore, when the act of 1909 employed those terms, they were written into the law with this definition attached, and the legislature must have intended that they should be so understood.

2. The act in question is unconstitutional and void for the various reasons set out in the motion to quash heretofore copied in this opinion.

The purpose of the act, as stated in its title, is to "prohibit the sale" of intoxicating liquors as a beverage near any schoolhouse, etc., and the language used to define the thing forbidden is "that it shall not hereafter be lawful for any person to sell or tipple any intoxicating liquors, etc., as a beverage within four miles of a schoolhouse."

Therefore the use of the words "to prohibit the sale of intoxicating liquors," if standing alone, would undoubtedly embrace all sales, and they must be held to so include them, unless the words "as a beverage" restrict the scope of legislation designated by the title in such manner as to limit the word "sale' to a particular kind of sale.

Counsel for defendant, while conceding that the word "sale" used in the title is a word of general signification, contend that its "general character is cut down" by the use of the words "as a beverage near a schoolhouse" in connection with it, and these words qualify its meaning to such an extent and in such way that the one thing prohibited by the title is "a sale as a beverage near a schoolhouse." And, as we understand the argument of counsel, they go further, and say that a beverage sale is a "sale of liquors to be drunk for the pleasure of drinking." It would follow from this that the only sale embraced in this title is a sale where there concurs with the fact of the sale an intention upon the part of the seller that the purchaser should drink the liquor for the pleasure of drinking.

Hence it is argued that the words "to sell or tipple," used in the body of the act to designate the offense denounced, must be understood to fall within this narrow compass of the title, and, in order that this may be true, and the act not be duplex, it is necessary to construe "sell or tipple" to mean tipple only; that is, "tipple" is explanatory of sell, and the act should be read as though it said "it shall not herafter be lawful for any person to sell, that is to say, tipple, etc." It is further said that the word "tipple" has acquired a meaning of its own in our liquor legislation, and that this court has here often defined it to mean "to sell to be drunk at the place of sale;" and from this postulate it is concluded that, as a tippling sale is a retail sale, the only sale forbidden by the act is a retail sale. It is also said that the word "or," used between the words "sell" and "tipple," means that "tipple" is explanatory of "sell," because if that were not true, and it was used in a disjunctive sense to indicate two kinds of sales, it would render the act unconstitutional because the body of the act would be broader than its caption.

Counsel cite us the dictionary definition of the words "beverage," "tipple," and "or," and invite us to a consideration of their abstract and literal meanings; but this we must decline to do, because the inquiry here is, not what their strict and accurate definitions may be according to acepted usage and the approved authority of the lexicographers, but in this case, as in all others, involving the construction of statutes, the sole question is: What was the legislative intent? This intent must

be ascertained from an examination of the statute itself in connection with other statutes *in pari materia,* and in the light of the history of the system of legislation of which it is a part.

"In the course of the entire legislative dealing with the subject," says Mr. Black, "we are to discover the progress and development of a uniform and consistent design, or else the continued modification and adoption of the original design to apply it to changing conditions or circumstances. In the passage of each act, the legislative body must be supposed to have had in mind and in contemplation the existing legislation on the same subject, and to have shaped its new enactment with reference thereto. Hence the same principle which requires us to study the context for the meaning of a particular phrase or provision, and which directs us to compare all of the several parts of the same statute, only takes us on a broader scope when it bids us read together, and with reference to each other, all statutes in *pari materia.*" Black on Interpretation of Law, p. 204.

Mr. Endlich admirably states the rule of construction under consideration in these words: "It requires particular phrases, left doubtful by the act itself, to be construed as synonymous with, or analogous to, the same phrases used in other statutes upon the same subject in such connections and surroundings as define their meaning beyond question, or point emphatically to a certain interpretation. It requires gaps left in the act, not amounting to *casus omissi,* to be filled from the materials supplied by other statutes upon the same sub-

ject and in harmony with them. It requires words capable of several meanings, the choice among which is not determined by the use of the words in a definite and unmistaking sense in one of the statutes, to be so construed, if possible, as to preserve in force and effect, side by side with them, the words of earlier statutes, to the avoidance of an interpretation which would raise a repugnancy between the earlier and later statutes, fatal to the former." Endlich, Interpretation, sec. 53.

Before examining the original four-mile law of 1877, it is proper to recapitulate the legislation upon the liquor traffic in existence at the date of the passage of this law, so that we may view the situation as it must have appeared to the legislature at the time of its passage.

Many laws had been passed upon the subject having for their purposes the regulation and restriction of the sale of intoxicating liquors as well as other laws forming part of our revenue system whose primary object was the raising of revenue, but the enforcement of which necessarily became restrictive, and aided largely the regulation statutes.

At an early day, it was made unlawful to carry and sell or offer to sell intoxicating liquor within one mile of any place of worship, such sale or offer to sell not being at the regular place of business of the seller. Shannon's Code, sec. 2567.

It was unlawful to sell or to give intoxicating liquors to a minor, to an habitual drunkard; to sell or keep for sale intoxicating liquors within two miles of the insane hospital buildings; to sell intoxicating liquors in theaters or places of amusement; to give or sell intoxicating liquors to any person at or near an election ground; or to keep open the places of such sales on election day. It was also unlawful to sell intoxicating liquors within one-half mile of the inclosure around the fair grounds of any agricultural or mechanical association or society.

It will be observed that all of the foregoing statutes had for their object a restriction and regulation of the traffic, and the sales were forbidden under the conditions stated without regard to the quantity or the purpose for which the sale was made or whether the seller had a license. By section 4857 of the Code (section 6780 of Shannon's Code) it was provided that "it is a misdemeanor to sell spirituous or vinous liquors without first obtaining a license therefor;" and by section 18 of chapter 45 of the Session Acts of 1868-69 it was provided "that dealers in spirits, wines, liquors, etc., may take out a quarterly or semiannual license at the present rate of taxation;" and by section 5 of the same act a special privilege tax was imposed upon "retail dealers in spirits, wines, ale, beer or other malt liquors." From this it will be observed that there could be no sale of intoxicants under our revenue laws without a license having first been obtained for the purpose until the passage of chapter 51 of the Session Acts of 1870, wherein it was provided "that hereafter all regularly licensed

druggists in this State without obtaining an additional license therefor be, and they are hereby authorized to furnish vinous liquors to any church officer to be used for sacramental or communion purposes or to fill the prescription of any regularly practicing physician prescribing spirituous or vinous liquors as a medicinal remedy;" and by section 2 of the same act it was further declared "that the sale or gift of any spirituous, vinous or malt liquors by any druggist in this State except as provided in the first section of this act shall be unlawful and subject the person offending to all the penalties now prescribed by law for selling liquors without license."

The original four-mile law (chapter 23, Acts 1877) is as follows:

"An act to prohibit the sale of intoxicating liquors near institutions of learning.

"Section 1. Be it enacted by the general assembly of the State of Tennessee, that it shall not, hereafter, be lawful for any person to sell or tipple any intoxicating beverage within four miles of an incorporated institution of learning in this State, and that any one violating the provisions of this act shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than one hundred dollars, nor more than two hundred and fifty dollars, and imprisonment for a period of not less than one nor more than six months.

"Sec. 2. Be it further enacted, that this act shall not apply to the sale of such liquors within the limits of any incorporated town, nor to sales made by persons having licenses to make the same at the date of the passage of

this act, during the time for which such licenses were granted, nor to sales by manufactories of such liquors in wholesale packages or quantities.

"Sec. 3. Be it further enacted, that this act take effect from and after its passage, the public welfare requiring it.

"Passed March 19, 1877."

Learned counsel agree that this is the beginning of a system of legislation dealing with the liquor traffic which culminated finally in the passage of the act under consideration. They also agree that the thing prohibited by the act of 1877 and the act of 1887 is. the same thing prohibited by the present act; the disagreement between counsel being as to the proper construction of the first section of these various acts.

It will be observed that the word "beverage" does not appear in the title of the act of 1877 and only appears in the body thereof, but not there in the same connection that it appears in the title and bodies of the two other four-mile laws of 1887 and 1909. There is nothing in the title to this act nor in its body which would indicate that the offense denounced was to be determined by the purpose for which the sale was made. The prohibition is against the sale of intoxicating liquors near institutions of learning, as stated in its caption, and the offense denounced in the body of the act is "selling" or "tippling" any intoxicating beverage within four miles of an incorporated institution of learning.

While we know, as a matter of public history, that there was perhaps but one incorporated institution of

learning in this State which was situated outside of an incorporated town at the date of the passage of this act, nevertheless the language employed in the act upon its face would appear to be a general regulation of the traffic and not a local law. Certainly, the language was so employed by the extension of the territory included in this original act in the enactment of chapter 167, Acts 1887, wherein it was made unlawful for any person "to sell or tipple any intoxicating liquors . . . within four miles of any schoolhouse, public or private, where school is kept, whether the school be in session or not." Like the original act, this one excepted from its provisions the sale of liquors within the limits of any incorporated town and the sales by manufacturers in wholesale packages or quantities. But, with these exceptions retained in the law, the territory to which it applied covered almost every community in the State that was not included with the limits of an incorporated town.

By chapter 221, Acts 1899, it was provided that those communities included within the limits of incorporated towns within the exception of section 2 of the act of 1887, might be reduced upon a repeal of the charter of incorporation to towns of not more than 2000 inhabitants by the federal census of 1890, but the exception in favor of sales made by manufacturers in wholesale packages or quantities was still retained.

By chapter 2 of the Acts of 1903, the exception in favor of sales made within the limits of any incorporated

town was again reduced by providing that this exception should be withdrawn from towns having a population of not more than 5000 inhabitants which were thereafter incorporated; and by chapter 17, Acts 1907, the exception in favor of sales made within the limits of any incorpoated town was again restricted so as to withdraw this exception from all towns and cities of not more than 150,000 population thereafter incorporated.

The withdrawals of the exceptions made in favor of incorporated towns contained in the original acts of 1877-87 were not unconditional, but applied only to such towns of the population stated in each amendment thereof that were incorporated after the passage of the act. As a matter of course, it was not expected that towns and cities should grow up from the beginning until they attained the population stated in these laws; rather, it was a form of local option not necessarily depending upon the approval of a majority of the voters within the limits of the town, but depending entirely upon the town surrendering its charter and reincorporating after the passing of the law.

Chapter 17 of the Acts of 1907 could have been made to operate as a withdrawal of this exception as to every city and town in the State, and this would have left the act of 1887 in force without exception, save the one made in favor of sales made by manufacturers in wholesale packages or quantities. With this state of the law, the legislature passed chapter one of the Acts of 1909, employing the exact language used both in the title and

section 1 of the act of 1887, but omitting entirely the exceptions contained in that act in favor of sales made within the limits of incorpoated towns, and sales made by manufacturers in wholesale packages or quantities.

At the same session of the general assembly, a privilege tax was levied upon liquor dealers, both wholesale and retail, by chapter 479, and it was provided "that nothing in this act shall authorize or legalize the sale of liquors." By chapter 14 of the session acts for the same year, it was provided "that all money paid for licenses for a term after July 1, 1909, by dealers of liquors, wines, beers, etc., as liquor dealers in this State, shall be and the same is hereby ordered returned to such parties paying the same covering the time when they would have allowed to operate their places of business had no law been passed prohibiting the sale of intoxicating liquors within the State of Tennessee, it being the intention of this act to provide that all money paid to the State, county, or municipality, as the case may be, for licenses for liquor dealers for the time following July 1, 1909, shall be returned to such dealers and paid out of the State, county or city treasury, as the case may be, where the same has been paid by such dealers."

After the decision of Harney's Case, *post*, the common defense interposed to indictments for selling intoxicating liquors within four miles of a schoolhouse was that defendant was acting as agent of the purchaser, and this subterfuge operated in many instances to relieve really guilty parties of the penalties of the law;

and to eliminate this defense the legislature, by chapter 422 of the Acts of 1905, made it "unlawful for any person to buy for another intoxicating liquors within four miles of any schoolhouse, public or private, where school is kept, whether the school be in session or not," except from licensed dealers in incorporated towns where it was legal to make such sales. This enactment is valuable as indicating the legislative understanding of the words "to sell or tipple" used in the Acts of 1887, because the inhibition is against any person buying for another, and the word "buy" as used here would include a purchase either at wholesale or retail.

Holding all of these enactments in one view, and construing the last act with reference to all others upon the same subject, which had preceded it, can it fairly be said that the legislature intended to single out tippling as the only form of the traffic to be prohibited? We think not. The word "sale" used in the title of the act is used in its common and ordinary sense, and includes all sales except nonbeverage sales without regard to their form or character. The word "tipple" is introduced in the body of the act to denote a subdivision of the more comprehensive term "sale" as used in the title, and its equivalent "to sell" as used in the body. It is true, as counsel assert, that a "tippling sale," giving to it the definition it seems to have acquired in our whisky statutes, is a sale of intoxicants "to be drunk at the place of sale" and is a retail sale. *Harney* v. *State,* 8 Lea, 114.

But, of course, a tippling sale is not the only kind of retail sale. At the time of the passage of the original four-mile law of 1877, our revenue statutes recognized the wholesaling and retailing of intoxicating liquors as separate vocations, and taxed them as unconnected and independent privileges. It cannot be considered that the legislature was unmindful of this classification when it later selected the sales to be prohibited. This classification is of comparatively recent origin, having been first introduced into our statutes by the act of 1868-69, supra. But tippling sales—that is, sales "for consumption on the premises" or "to be drunk at the place of sale"—were made taxable privileges in the reign of James I, and punishment provided for the unlawful exercise of the privilege.

Mr. Blackstone (book 4, star page 64) refers to them as "wholesome statutes" by way of "prevention of drunkeness" which regulate "the licensing of alehouses," etc.

Thus, we see that it was early discovered that tippling sales were fruitful sources of drunkenness, disorder, and crime, and from time out of mind they have been in a class unto themselves. While they are retail sales, and the particular kind of sales most obnoxious to our laws, yet they are not the only retail sales, as clearly appears from our legislation on the subject and the decision of this court under them. *State* v. *Tarver,* 11 Lea, 658; *Harrison* v. *State,* 96 Tenn., 548, 35 S. W., 559.

Thus, in Lowenhaught's Case, afterwards reaffirmed in *Harrison* v. *State,* supra, it was said that "sales to

persons or customers for purposes of consumption constitute a retail dealer," and that the "distinction between a wholesale and retail dealer does not depend upon the quantity sold by either." *State* v. *Lowenhaught,* 11 Lea, 13; *State* v. *Tarver,* 11 Lea, 658.

So, if it be conceded that the purpose of the original act was a limited one, and intended solely for the protection of students attending school, as insisted by counsel, the change of the legislative purpose is made manifest by the adoption ten years later of the act of 1887; and a purpose of prohibition generally within the territory described in this latter act is substituted for one of protection to a class contained in the act of 1877. The act of 1887 purports to be an original act. It makes no reference to the act of 1877, nor does it appear to amend or repeal it in any particular. Nevertheless it is a continuation of the enlarged purpose of regulation extended to all territory within four miles of a "schoolhouse, public or private, where school is kept, whether the school be in session or not."

It cannot be fairly said that the purpose of this legislation is limited to the "protection of young students while being educated." We know judicially that our present public school system was well under way of development in 1887, and by its terms there was not a civil district in the State that did not have a house in it "where school was kept," and the prohibition of this act extended to sales within four miles of such house whether school was in session or not.

Kelly v. State.

These schools were in session from two to six months in the year, and the remainder of the year they had no students. Under these considerations the enlarged purpose of the legislature becomes manifest. The selection of a "schoolhouse where school is kept" as the center from which the prohibited territory should radiate was a convenient and ingenious method of securing an automatic extension of the law. It set the forces of civilization, and especially the development of our system of common free schools, to work against the sale of intoxicants. As communities would be settled up, dwellings built, the land brought under tillage, and a house erected "where school was kept," this law at once, and of its own inherent force and application, drew a circle of a radius of four miles around the schoolhouse, where intoxicating liquors could not be sold any day in the year "whether the school was in session or not."

But counsel say the words "as a beverage" restrict the word "sale" so that it means a sale for consumption "for the pleasure of drinking." It should be borne in mind that it is "to sell as a beverage" that is prohibited, and not to drink as a beverage. It is the seller's purpose that is referred to, and not the purchaser's. The quantity so sold is not limited by the statute, and there is nothing in the language employed that necessarily restricts the prohibition to immediate consumption sales. The plaintiff in error sold ten barrels of whisky knowing that it would be resold in "small and large quantities" in the ordinary course of trade. Its ultimate destination was the consumer, the purchaser being merely a

distributor, and there is no suggestion in the evidence that it was not intended by all parties that, when the whisky finally reached the consumer, it would be sold as a beverage. Plaintiff in error sold as a manufacturer in wholesale quantities, and thereby became the initial distributor of the whisky to the general trade, and its purpose with respect to the final sale to the consumer must have been general and promiscuous. This would include beverage sales, as well as all other kinds of sales, and would clearly fall within the prohibition conceded by its learned counsel. When a sale is proven, the burden shifts to the defendant to show that it was lawfully made for a lawful purpose, and it would be straining too far to say that a sale in quantities to be distributed to the public generally for all purposes negatives a purpose upon the part of such seller that it was sold as a beverage.

The view herein expressed of the meaning of the first section of the act of 1887 is very much strengthened and reenforced by a consideration of the effect to be given to the exception contained in the second section of the act in favor of sales made by manufacturers in wholesale packages or quantities. Counsel for plaintiff in error assert that this exception was introduced into the act out of an abundance of caution, and not because the first section covered manufacturers as such; but the reply to this contention is obvious.

If it be conceded that this was the reason for introducing the exception into the original act of 1877, the subsequent action of the legislature demonstrates be-

yond the peradventure of a doubt that its purpose towards this exception had manifestly changed, and it regarded the exception as withholding this class of sales from the operation of the first section.   Indeed, subsequent to 1887, the method employed to extend the operation of the first section of the latter act was by amendments to the second section which withdrew from the effect of the second section sales made within incorporated towns of a given population thereinafter incorporated.

However, it is not conceded, nor do we understand, that the exception referred to was introduced as a matter of caution.   Counsel say that the senator who offered the amendment to the act of 1877, as introduced, and which contains this exception, represented the counties of Cannon, Coffee, De Kalb, Overton, and Warren, a district wherein were located many distilleries, and therefore, it is argued, that this amendment was offered and incorporated into the original act "as an abundance of precaution, and not because the first section covered manfacturers as such."

We cannot conceive that the existence of these facts establishes the conclusion reached by counsel, especially when the language employed in the first section is broad enough in its scope to include sales excepted by the second section as we have already seen.   It would require the strongest showing in the debates at the time the act was passed, and of the circumstances surrouunding the passage of the act, to induce the court to hold that this exception was introduced as a result of overcaution.

Kelly v. State.

The rule of construction in respect of such matters is general, and so far as we know without exception, that the mere fact that the legislature excepted from the words of the first section of the act the sales designated in the second section raises a strong presumption that it was intended to forbid all sales by the first section that were not excepted from its operation by the second section.

Chief Justice Marshall, in *Brown* v. *Maryland*, 25 U. S., 419, 6 L. Ed., 678, states that it is "a rule of interpretation, to which all assent, that the exception of a particular thing from general words proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made."

The same learned judge, in *Gibbon* v. *Ogden*, 22 U. S., 191, 6 L. Ed., 23, stated the rule under consideration in this language:

"It is a rule of construction, acknowledged by all that the exceptions from a power mark its extent; for it would be absurd, as well as useless, to except from a granted power that which was not granted—that which the words of the grant could not comprehend."

"An express exception, exemption, or saving excludes others. Where a general rule has been established by statute with exception the court will not curtail the former nor add to the latter by implication. Exceptions strengthen the force of a general law, and enumeration weakens it as to things not expressed." Lewis'

Sutherland, Statutory Construction, section 494; 26 Am. and Eng. Ency. of Law, 680, 681.

As already indicated in this opinion, we hold that the word "or" connecting the words "sell" and "tipple" is used in a disjunctive sense, and to paraphrase the language of Mr. Justice Lamar in *Kidd* v. *Pearson*, 128 U. S., 1-19, 9 Sup. Ct., 6, 32 L. Ed., 346, the conjunction is disjunctive. To sell is forbidden, to tipple is forbidden, and each is forbidden independently of the other. It seems to be a general rule of construction that in penal statutes "or" cannot be given a conjunctive construction where it is used between the descriptions of different offenses. This is stated to be the rule in 29 Cyc., at page 1507, and many illustrations of its application are given in note 43 on the same page.

Counsel broadly state that this court in construing the act of 1877 has held that the only sale prohibited by it was a retail sale for the purposes of consumption. In support of this position we are cited to *Harney* v. *State*, 8 Lea, 114; *Lea* v. *State*, 10 Lea, 480; *State* v. *Odam*, 2 Lea, 221; *State* v. *Staley*, 3 Lea, 566; *Dobson* v. *State*, 5 Lea, 274.

An examination of these cases discloses that the court did not have under consideration in any one of them the question that is presented in this case. Each of those cases was a tippling sale under the facts, and the court in discussing the facts referred alone to the word "tipple" used in the act of 1877.

In none of the cases did the court undertake to define the word "sale," or to speak of the relationship of

the two words as used in the body of the act, and as discussed in this case. It could not profit to review the cases separately; but it is sufficient to say that we have examined them, and in no one of them has the court considered the question as to whether the first section of either the act of 1877 or act of 1887 prohibited the sale of intoxicating liquors in wholesale quantities.

The court did define the word "tipple" as used in those acts and limited it to a particular kind of retail sale and defined the word to include much less than the word "sale." Instead of supporting the defendant's position, the cases relied upon seem to weaken it; for if, as the court said in Harney's Case, "the word tipple in the act of 1877 means to sell to be drank at the place of sale," this would show that the inhibition against tippling did not include other retail sales which it is now conceded were made unlawful by these acts, and they could only be drawn into the category of forbidden sales by resorting to the other word "sell" used in connection with "tipple," and this would prove that the word "or" was used in a disjunctive sense.

It is finally stated upon this phase of the case that, if it be held that the first section of the act of 1887 includes wholesale sales, the exception contained in the second section in favor of sales in wholesale packages or quantities by the manufacturer would render the act unconstitutional and void because this would be an unreasonable and arbitrary distinction in favor of the manufacturer as against wholesale dealers who were not manufacturers.

This is strongly urged as showing that the legislature did not intend to embrace within the terms of this act wholesale sales by wholesalers other than manufacturers, because the court will always give an act the construction that will harmonize it with the fundamental law where this can be done.   To this rule of construction we most heartily assent.   It is too universal in its application to require the citation of authority to sustain it.   But counsel assume too much when it is assumed that there was no exception in favor of wholesale sales by wholesale dealers not manufacturers.   They could sell "the same thing, to the same persons, and in the same wholesale packages or quantities" that the manufacturer could; the difference being that they must sell within the limits of an incorporated town, while the manufacturer could make such sales either within or without an incorporated town.   This distinction is natural, reasonable, and just, and therefore it does not militate in the least against the construction of the first section of the original four-mile law which we have given in this opinion.   The distinction is based upon the nature of the two occupations and is a reasonable one with respect to both.   Of course, in this view, neither could sell at retail.   The legitimate customers of both, the retailers, were all situated within the incorporated towns.   There are many natural reasons why the distiller would profit by permitting the manufacture of whiskies in the country which would not benefit the wholesaler not a manufacturer.   It would be absurd to

say that the distiller might manufacture his whiskies outside of an incorporated town and then forbid the sale of it altogether. Hence he was permitted to sell in wholesale quantities or packages. But there is no reason conceivable, either in the nature or character of his business, or his situation with respect to his trade, why a wholesaler, not a manufacturer, would suffer the slightest inconvenience by having his business restricted to the incorporated towns.

This has been the practice under this act, and there has never yet been a complaint from such wholesaler that he had suffered any inconvenience from its practical operation.

It is next insisted that this law is invalid and unconstitutional because: First, it violates article 2, sec. 17, of the constitution of Tennessee, in that the body of the act is broader than its title, and that the wholesaling of liquor is not a sale as a beverage and therefore not expressed in the title, and this act does not recite in its caption or otherwise the title or substance of the four-mile law of 1887, of which it is said it is amendatory.

It is also said that, if the act is construed to prohibit sales of liquor in wholesale quantities, it is violative of article 1, secs. 8 and 21, of the constitution of Tennessee, as well as the fifth amendment and the due process clause of the fourteenth amendment to the constitution of the United States.

In support of the first constitutional objection to the law, it is said that the title of the act which forbids the sales of intoxicating liquors near any schoolhouse does

not warrant legislation under it which forbids such sales within four miles of such schoolhouse for the reason that, when the nature and purpose of the act is taken into consideration, as well as the situation and circumstances surrounding students while being educated and in attendance at school, the prohibition of such sales within four miles is not near the schoolhouse, and, therefore, the body of the act is broader than its title.

Counsel concede that "near" is a relative term and has a variable meaning, and that its proper import is always dependent upon the sense and connection in which it is used when considered together with the purposes to be accomplished.

It is said, though, that this act of 1887, as well as the one of 1909, had for its sole object the protection of students while attending school, and that students are under orders, their hours are full, their time is limited, and they are under the surveillance of a master; and hence four miles of a schoolhouse, when referring to students attending school, for the purpose of restricting their activities, is not near the schoolhouse.

We have already seen that the legislative purpose in enacting the four-mile law of 1887 was a much broader and larger one than that which produced the original four-mile law of 1877. The institution of learning designated in the act of 1877 was an incorporated institution, which we all know was a very different order of school to those referred to in the act of 1887. In such an institution, it may be true that the students are under the surveillance of a master, that their hours are

full, and their opportunities to visit places of the illegal sale of whisky are limited. The act of 1887 refers to "a schoolhouse where school is kept, whether the school be in session or not," and this, of course, includes every schoolhouse, public or private, within the State where school is kept. To say that four miles, when used with reference to country schools, is far away and not near, and beyond the activities and opportunities of the country boys who attend those schools, would be to discredit our own intelligence as well as to reflect upon the proudest history of rural Tennessee. It is a fact, resting in the experience of many, that pupils attended, and today attend, country schools at greater distances than four miles and find no special inconvenience or difficulty connected with it. With all due respect to learned counsel who press this argument upon us, we can only say that it does not appeal to us in the slightest degree. Even if there should be some question as to whether four miles were near, after the lapse of so long a time, and the legislative definition of four miles had been repeatedly given to the word "near" when used in connection without whisky statutes, we would be very slow to hold that a law that has been before the court so often upon almost every phase of its meaning and validity is to be discovered to be invalid at this late date upon a definition to be given to a word, which, it is conceded, is relative in its meaning, and, in its nature, cannot have a positive and precise definition.

In the language of Mr. Justice Turley, in *Hadley* v. *Turnpike Company,* 2 Humph., 555: "What is 'near' is

a difficult thing to argue about, and we shall not at-
tempt it; and surely it would be difficult to say that a
difference in a mile and a half is unreasonable."

It is also said that the title to the act in question lim-
its the scope of legislation to the prohibition of bever-
age sales of intoxicating liquor, and therefore, if the
body of the act is to be construed as forbidding sales in
wholesale quantities, the law is invalid because the body
is broader than the title, in that wholesale sales are not
beverage sales.  We have already seen in the construc-
tion of the act of 1887 that the first section thereof for-
bids all sales except nonbeverage sales.  Counsel mis-
conceive the nature of a beverage sale and give it an en-
tirely too limited and narrow meaning when it is in-
sisted that a sale cannot be made as a beverage unless
it is made to be consumed by the immediate purchaser.
We suppose it would not be contended that if a sale were
made, not to be consumed by the purchaser, but for con-
sumption generally for the pleasure of drinking by the
mediate or immediate purchaser, or any one else who
might afterwards be let into its consumption, that such
would not be a beverage sale.  It is not necessary , in or-
der to make a sale as beverage sale, that the seller should
understand that the intoxicants were to be consumed
immediately by the purchaser or at any particular place.
Counsel insist that the proper meaning of the act of
1887 is to forbid a consumption sale at the place of sale,
and that the place of sale, under that act, is within four
miles of a schoolhouse.  But at what time, under this
insistence, would it be necessary that the consumption

should take place in order to make it a beverage sale? Whisky so sold to be consumed at any time by any person at any place, whether within four miles of a schoolhouse or not, as a beverage, is a beverage sale forbidden by the plain letter of the law.

It is true that the legislature recognized that there were certain sales that might be made which were nonbeverage sales, and, indeed, express enactments in force at the time of the passage of the first four-mile law directly authorized them. Sales made by druggists upon the prescription of a physician, were declared in effect to be nonbeverage sales. Such a sale and sales for mechanical, medicinal, sacramental, chemical, scientific, and like purposes are nonbeverage sales, and all other sales are beverage sales. Certainly, it cannot be said that the mere fact that the purchaser from plaintiff in error did not intend to consume the whisky sold, when the plaintiff in error, the seller, contemplated that the whisky would be ultimately consumed by the trade generally, would bring this transaction within the meaning of a nonbeverage sale.

While the motion to quash, made in the court below, included, among other things, the proposition that the act in question was an amendatory act, and was invalid because it did not recite in its caption or otherwise the title or substance of the laws amended, this proposition is not argued in brief in this court. We think it clear that the proposition is unsound for the reason that this act does not appear to be an amendatory act, but is of and within itself a complete treatment of the subject of legis-

lation with which it deals, and for these reasons, upon the authority of all of our cases, the act is not violative of the section of the constitution invoked against it. *State, ex rel.,* v. *Taylor,* 119 Tenn., 253, 254, 104 S. W., 242; *Terrell* v. *State,* 86 Tenn., 523, 8 S. W., 212; *Zickler* v. *Bank,* 104 Tenn., 277, 57 S. W., 341.

Finally, it is insisted that this act is invalid, if construed to prohibit the sale of liquor in wholesale quantities, because it violates sections 8 and 21 of article 1 of the constitution of Tennessee, and the fifth amendment to the constitution of the United States, as well as the due process clause of the fourteenth amendment of the constitution of the United States.

The insistence of learned counsel under these objections can best be stated in their own language:

"(4)    It is void because it takes the complainant's property without making compensation therefor.

"(5) It is void because it makes unlawful and criminal for the complainants [plaintiff in error] to sell liquors which were lawful, recognized, articles of commerce, in existence, and on hand, when this act was passed, without either making compensation for the value of the liquors so destroyed, or allowing sufficient time in which to sell the same before the act should become operative.

"(6) It is void because under the fourteenth amendment it denies the equal protection of the laws and takes complainants' [plaintiff's in error] property without due process of law, in that it violates the provisions of the constitution on which propositions of the constitution on which propositions 4 and 5 are based, so far as complainants are concerned."

These propositions assume: First, that there has been a taking of the property of plaintiff in error; second, that the liquors sold were lawfully in existence and on hand when this act was passed, and that the act failed to allow sufficient time in which to sell the same before it went into effect.

Under the facts of this case, we are compelled to hold that no such questions are presented. The testimony of Mr. Carl White, the president of plaintiff in error, which is the only testimony in the record upon the subject, is as follows:

"Q. Did you or not sell to the Wakeman Distilling Company about January 10, 1910, 10 barrels of whisky?

"A. Yes, sir.

"Q. What kind of whisky, what brand of whisky, was it?

"A. It was our 'Deep Spring Whisky' that we make.

"Q. Mr. White, do you remember about how many barrels of whisky the defendant had on hand on January 20, 1909, the date of the passage of the four-mile law?

"A. Well, it had something like 7000 barrels 7000 or 8000 barrels.

"Q. After the passage of that law, state whether or not the defendant made every effort possible to dispose of the whisky it had at a fair price.

"A. Yes, sir.

"Q. Please state how much whisky you had on hand on July 1, 1909, when the Hollady bill went into effect.

"A. Well, as near as I can remember, they had something over 6000 barrels.

"Q.  State whether or not the value of that whisky was something like $600,000.

"A. With the tax, yes.

"Q. That included the tax, the $1.10 per gallon due the United States government?

"A. Yes, sir.

"Q. This whisky when it is first distilled is called 'raw whisky?

"A. Raw whisky; yes, sir.

"Q. Before this whisky is ready for the market, state whether or not it has to go through what is known as the 'mellowing process'?

"A. Yes, it has to set in the warehouse for a certain length of time to be palatable.

"Q. About how long to make it palatable and saleable whisky

"A. It really ought to set in there about three years.

"Q. Did the defendant company have the greater part of its whisky still on hand on January 10, 1910.

"A. Yes, sir."

We are of opinion, and so hold, that the foregoing testimony falls far short of bringing the sale made by the plaintiff in error within the protecting shield of the sections of the constitutions of Tennessee and of the United States relied upon by counsel. It does not appear from this testimony whether the whisky which the plaintiff in error had on hand at the date of the passage of the Hollady bill, and at the date of its going into

effect, as well as the date of the sale made for which it is indicted in this case, were for the same, or any part of the same, whisky; nor does it appear that the plaintiff in error has not continued to manufacture and purchase and store and intermingle the whiskies it had on hand on the 20th day of January, 1909, with other whiskies which were not in existence, and not property of plaintiff in error, at the time this law went into effect on July 1, 1909.

It does not appear what efforts have been made by the plaintiff in error to dispose of the 7000 barrels of whisky which it had on hand on the 20th day of January, 1909, nor how many barrels have been sold, or whether its efforts have been to sell them by wholesale, or by retail only, or both wholesale and retail, the only fact vouchsafed to the court being the general statement of Mr. White in response to a very leading question put by his counsel, that the plaintiff in error had made every effort possible to dispose of its whiskies at a fair price.

We think it entirely clear that the mere statement of the facts disclosed by this record shows that there is not made out a case of the taking of property at all, nor a violation of the due process clause, either of the constitution of Tennessee or of the United States. It is conceded by learned counsel, and the concession is well sustained by the authorities, that a citizen, asking the courts to set aside an act of the legislature because violative of the constitution in these respects must bring himself clearly within the case stated and relied upon. It is also conceded that, if the time allowed by

Kelly v. State.

the legislature in which to dispose of the whiskies on hand at the date the law in question was enacted, January 20, 1909, until the date that it went into effect, July 1, 1909 was reasonable, there would be no violation of any fundamental law, either of Tennessee or of the United States. The only evidence to show that the time allowed was insufficient is the evidence above set out. The presumption is that the time allowed was ample.

*State* v. *Burgoyne,* 7 Lea, 173, 40 Am. Rep., 60:

"This, in our opinion, preserves the right of the property in its use, sale, and enjoyment. It is given to the owner of property, the right to sell within a sufficient time, that property which the public welfare requires shall not be sold at all. The law does not operate so rigidly on property in existence at the passage of the act so as to deprive the owner of its property. The vested rights of property in the articles deemed injurous to the safety of society stood in the way of public good; such rights have been compensated for and protected by the proviso."

The courts sit for the purpose of determining the rights of parties as they are presented upon the records brought to them. They cannot enter into a general discussion of the state of the law, but must confine themselves to the issues raised upon the record, and hence we decline to express any opinion upon the constitutional questions under consideration for the reason that the plaintiff in error has clearly failed to show that it is within the application of those provisions of the constitution invoked in its behalf.

The judgment is affirmed.

Mr. Justice Beard dissented.