### IN THE

# SUPREME COURT OF TENNESSEE

### FOR THE

## MIDDLE DIVISION

## NASHVILLE, DECEMBER TERM, 1924.

STATE ex rel. THOMPSON, ATTY. GEN., v. NASHVILLE RY. & LIGHT Co. et al.*

### (*Nashville.* December Term, 1924.)

**MONOPOLIES. Anti-Trust Act held inapplicable to public utility companies.**

Anti-Trust Act (Acts 1903, chapter 140) *held* inapplicable to public utilities such as electric power companies, in view of Acts 1887, chapter 198, Acts 1895, chapter 29, Acts 1903, chapter 406, Acts 1907, chapter 437, and Acts 1909, chapter 127, relating to and specifying powers of corporations, and Pub. Acts 1919, chapter 49, sections 3, 6, authorizing consolidation of such public utilities companies with approval of the Public Utilities Commission.

Acts cited and construed: Acts 1903, chs. 140, 406; Acts 1887, ch. 198; Acts 1895, ch. 29; Acts 1907, ch. 437; Acts 1897, ch. 10; Acts 1909, ch. 127; Acts 1919, ch. 49, secs. 3, 6.

Cases cited and approved: Standard Oil Co. v. State, 117 Tenn., 620; State v. Standard Oil Co., 120 Tenn., 86; Coal Creek, etc., Co. v. Tenn. Coal, etc., Co., 106 Tenn., 651; Knapp v. Golden Cross, 121 Tenn., 212.

Constitution cited and construed: Art. 1, sec. 8; Art. 11, sec. 8.

*Headnote. Monopolies, 27 Cyc., p. 902 (1926 Anno).

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County. —Hon. James B. Newman, Chancellor.

F. M. Thompson and Joe V. Williams, for the State.

Brown & Spurlock, J. M. Anderson, W. E. Nowell, Jr., Percy H. Clark and J. A. Fowler, for Power Co.

Mr. Justice Cook delivered the opinion of the Court.

This action is prosecuted by the attorney general on behalf of the State to annul contracts and arrangements of the corporations hereinafter named, upon the charge that they constitute a monopoly in the production, distribution, and sale of commercial electricity contrary to public policy, the common law and the Anti-Trust Act, Chapter 140, Acts of 1903.

The bill seeks a forfeiture of the charters of the defendants who are domestic corporations, and the expulsion from the State of the foreign corporations, because of their conduct. It appears that in 1912 the plan was initiated, which culminated in the monopoly alleged to be in violation of law. About that time the Chattanooga Railway & Light Company, a Tennessee corporation, operating in and about Chattanooga, owned a steam plant from which it distributed current to consumers, and produced power to operate its street railway system.

Tennessee Power Company, a Tennessee corporation, constructed hydroelectric power plants, and an auxiliary steam power plant for use in emergency, on the Ocoee river, and a hydroelectric plant on the Caney Fork river

at Rock Island. This company ran its lines into Chattanooga, and was competing with Chattanooga Railway & Light Company.

The Tennessee Railway Light & Power Company, a Maine corporation, was organized as a holding company by persons interested in the two companies named above, and was given control by lodgement of a majority of their voting stock, and by this means the management of both became united under one control, although each maintained a separate identity. The Chattanooga Railway & Light Company then entered into contracts with the Tennessee Power Company to abandon the use of its steam power plant and use power supplied by the Tennessee Power Company. It is charged that the Chattanooga Railway & Light Company abandoned its powers and functions as a public service corporation in respect to its generating plants, when it agreed to abandon the use of its power plant and let the Tennessee Power Company produce the electricity, and the power company abandoned in part its functions when it agreed that the Chattanooga Railway & Light Company should be left to the exclusive distribution of electricity.

It is further charged that this arrangement eliminated competition in the Chattanooga territory until the construction of a power plant at Hale's Bar, by the Chattanooga & Tennessee River Power Company, a Tennessee corporation. The Hale's Bar plant was completed in 1913, and the Chattanooga & Tennessee River Power Company was engaged in the erection of power lines into Chattanooga when, it is alleged, that for the purpose of suppressing competition, Tennessee Power Company leased the Hale's Bar plant at an annual ren-

tal of $600,000, on April 1, 1914. It is charged that in order to present an appearance of competition it was agreed that Chattanooga & Tennessee River Power Company should sell and distribute electricity to consumers in its own name, the Tennessee Power Company agreeing to pay operating expenses incurred by the Chattanooga & Tennessee River Power Company.

The Tennessee Power Company constructed lines into middle Tennessee, and, on February 1, 1915, Nashville Railway & Light Company, a Tennessee corporation, which owned a steam power plant at Nashville from which energy was distributed to its street railway system, and for lights and power to consumers, agreed to buy electricity from Tennessee Power Company. The Nashville Railway & Light Company agreed to abandon the use of its steam plant, which was to be kept in condition and used as an auxiliary plant under direction of the Tennessee Power Company.

It is charged that this left the distribution of power in exclusive control of the Nashville Railway & Light Company at Nashville under the arrangement to use power supplied from the hydroelectric plants of the Tennessee Power Company for the operation of the street railway and the interurban lines out of Nashville, and for the distribution of current to customers wanting lights and power within this territory; and that the Tennessee Power Company, under these arrangements, was given exclusive control over the production of electricity thereby removing the Nashville Railway & Light Company as a competitor.

Tennessee Railway Light & Power Company, which had voting control of the Chattanooga Railway & Light Com-

pany, acquired a majority of the stock in the Nashville Railway & Light Company, so that, through the holding company, common interests controlled Tennessee Power Company (which owned the plants on the Ocoee, and the plant on the Caney Fork) and controlled the Chattanooga Railway & Light Company (which owned the Street Railway Lighting & Power System in Chattanooga), and the Nashville Railway & Light Company (which owned the system about Nashville), and, by the lease to the Tennessee Power Company of the Hale's Bar plant, controlled that plant.

In 1922 a new holding company, the Tennessee Electric Power Company of Maryland, was organized, and arrangements were made for it to take over the voting stock or control of Tennessee Power Company, Chattanooga Railway & Light Company, Chattanooga & Tennessee River Power Company, and Nashville Railway & Light Company for the purpose of uniting them under one control. This arrangement gave to the consolidated companies exclusive control over the distribution of electricity in all the cities, towns, and villages within the area covered by their transmission lines. The bill was filed to restrain the consummation of the plan.

It is insisted on behalf of the State that electricity generated by steam and water power is an article manufactured of domestic raw material, within the terms of chapter 140, Acts of 1903, and that the foregoing arrangements constitute a monopoly in violation of the statute and the common law.

Demurrers were filed by the defendants named above, which challenge the sufficiency of the bill, upon the grounds that the matters therein set forth do not con-

stitute a violation of either the statute or common law relating to combinations in restraint of trade; that the anti-trust statutes of the State do not relate to public utilities which render service to the public; that no illegal act or agreement of the defendants is shown; that no reason is given for the long delay in bringing the suit; and that chapter 140, Acts of 1903, is unconstitutional, because violative of article 1, section 8, and article 11, section 8 of the constitution of Tennessee, and the Fourteenth Amendment and other provisions of the federal constitution. Answers coupled with demurrers were filed, proof was taken, and the cause was heard upon a stipulation that the questions raised by the demurrers should be disposed of first.

The chancellor sustained two grounds of demurrer holding that: (1) The contracts and arrangements set forth in the bill do not constitute a violation of either the statutes or common law of the State relating to monopolies and trusts; (2) that our antitrust laws do not embrace public utilities such as the defendants are shown in the bill to be, and dismissed the bill. The entire record was brought up on appeal. A discussion of all the grounds of demurrer would serve no purpose. The inquiry may well be limited to questions presented by the assignments of error that the chancellor erred:

"(1) In construing Acts of Tennessee for 1903, chapter 140, as not applicable to contracts and combinations entered into for the purpose of and having the effect of, suppressing or lessening competition in the manufacture and sale of electricity generated by steam and water power.

"(2) In holding (a) that electricity, the manufacture of which requires the consumption of a large amount of coal, is not an article manufactured from domestic raw materials within the terms of chapter 140, Acts of 1903; and (b) that electricity, the manufacture of which requires the use of water, is not an article manufactured from raw materials within the terms of said statute.

"(3) In holding that Acts Tennessee, 1903, chapter 140, does not apply to public utilities engaged in the manufacture, distribution and sale of electricity manufactured from steam and water power.

"(4) In not holding that on the facts shown of record the contracts arrangements and combinations entered into between the defendants had for their purpose or effect the suppressing or lessening of competition (a) in violation of Acts Tennessee, 1903, chapter 140; (b) the common law of Tennessee; and (c) the declared public policy of Tennessee.

"(5) In holding (a) that the contracts, arrangements, and combinations assailed in the bill were legally approved by the Railroad and Public Utilities Commission of Tennessee, and (b) that said Commission could legally approve said acts, all of which violated said chapter 140, Act of 1903.

"(6) In holding that approval by the Railroad and Public Utilities Commission, even if validly given, would legalize the contracts, arrangements, and combinations assailed in the bill.

"(7) In failing and refusing to decree the forfeiture of the corporate charters of defendants Tennessee Power Company, Chattanooga Railway & Light Company, Chat-

tanooga and Tennessee River Power Company, and Nashville Railway & Light Company, and to revoke the right of defendants Tennessee Railway, Light & Power Company and Tennessee Electric Power Company to do business in Tennessee for their several violations of the Acts of Tennessee, 1903, chapter 140, and the common law and public policy of Tennessee.''

The assignments of error present the inquiry of whether electricity and energy distributed in the form of service to the public is an article manufactured of domestic raw material within the meaning of chapter 140, Acts of 1903, and whether the act of 1903 embraces within its terms public service corporations.

Unquestionably the result of the contracts and arrangements above referred to was unity of control in the distribution of electricity within the territory covered by the lines of the Tennessee Power Company, which tended to lessen free competition. Chapter 140, Acts of 1903, which was sustained against attacks upon its constitutionality in *Standard Oil Co.* v. *State*, 117 Tenn., 620, 100 S. W., 705, 10 L. R. A. (N. S.), 1015; *State* v. *Standard Oil Co.*, 120 Tenn., 86, 110 S. W., 565, Id., 217 U. S., 413, 30 S. Ct., 543, 54 L. Ed., 817 provides:

''All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this State, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed,

or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are hereby declared to be against public policy, unlawful, and void.''

This act forbids combinations which lessen or tend to lessen competition in the importation or sale of articles brought into the State or in the manufacture or sale of articles of domestic growth, or domestic raw material, and all arrangements tending to control or reduce the cost to the producer or consumer of any such product or article are declared to be void.

The chancellor was of opinion that electricity was not an article of domestic growth, nor an article of domestic raw material such as is contemplated by the act. If it is an article manufactured from domestic raw material the inquiry is presented of whether or not the act of 1903 relates to public utilities; that is, public service corporations or persons engaged in the production and distribution of electricity or other public service. In relation to the matter of public utilities the legislature has declared a policy which does not forbid consolidation of their enterprises, but, on the contrary, authorizes consolidation under strict regulation and control. This purpose is evinced by chapter 198, Acts of 1887, chapter 29, Acts of 1895, chapter 406, Acts of 1903, chapter 437, Acts of 1907, chapter 127, Acts of 1909, and the acts hereafter referred to establishing the Railroad and Public Utilities Commission.

Chapter 198, Acts of 1887, confers power upon corporations, other than competing railroads, to lease and dispose of their property and franchises to others en-

gaged in the same general business, and to make any contract for the use, enjoyment, and operation of their property and franchises, or any part thereof, with any such other corporation of this or any other State, on such terms and conditions as may be agreed upon between the contracting corporations. *Coal Creek, etc., Co.* v. *Tennessee Coal, etc., Co.,* 106 Tenn., 651, 62 S. W., 162; *Knapp* v. *Golden Cross,* 121 Tenn., 212, 118 S. W., 390.

Chapter 437, Acts of 1907, empowers corporations to sell and convey their property and franchises to other corporations engaged in the same general business.

Chapter 29, section 2, Acts of 1895, authorizes street railway companies to purchase the capital stock and bonds of other street railways and to dispose of the same.

Chapter 406 of the Acts of 1903, section 1, empowers railroads and street railway companies to manufacture and distribute electricity from their own plants and from plants acquired by lease or other lawful contract.

Chapter 127, Acts of 1909, authorizes the incorporation of hydroelectric power plants to produce electricity, and section 4 of the act empowers them to contract with cities and villages, persons, firms, or corporations, for supplying them with water, light, heat, electricity, electrical and mechanical power, and any other article or thing which it may produce or handle.

When the Anti-Trust Act of 1903 was enacted, public service corporations distributing electric energy, gas, water supply, or those rendering any other public service where a municipality was interested, were subject to some measure of regulation under franchise ordinances of such municipalities. The first now existing legisla-

tion tending toward State regulation and control of a public utility was chapter 10, Acts of 1897, creating the Railroad Commission with power to prohibit unjust discrimination by railroads for service in carrying freight and passengers.

Chapter 49 of the Acts of 1919 enlarged the powers of the Railroad Commission and changed the name to Railroad and Public Utilities Commission. This amendatory act gave the Public Utilities Commission general supervision and regulation of, jurisdiction, and control over, all public utilities, and also over their property, property rights, facilities, and franchises, including the power to fix just and reasonable individual rates, joint rates, tolls, fares, charges, or schedules thereof, as well as commutation, mileage, and other special rates which shall be imposed, observed, and followed thereafter by any public utility as herein defined, whenever the Commission shall determine any existing individual rate, joint rate, toll, fare, charge, or schedule thereof or commutation, mileage, or other special rates to be unjust, unreasonable, excessive, insufficient, or unjustly discriminatory or preferential, howsoever the same may have heretofore been fixed or established. Sections 3, 4.

By the terms of the act no public service corporation can lease its property, rights, and franchises, or merge or consolidate with any other utility, without the approval of the Commission.

Section 3 of the act declares: "The term 'public utility' is hereby defined to include every individual, copartnership, association, corporation, or joint-stock company, their lessees, trustees, or receivers, appointed by

any court whatsoever, that now or may hereafter own, operate, manage or control, within the State of Tennessee, any street railway, interurban electric railway, traction company, all other common carriers, express, gas, electric light, heat, power, water, telephone, telegraph, or any other like system, plant, or equipment, affected by and dedicated to the public use, under privileges, franchises, licenses, or agreements, heretofore granted, or hereafter to be granted, by the State of Tennessee or by any political subdivision thereof.''

Section 6 provides: ''That no public utility as herein defined shall:

'' (a)   Make, impose, or exact any unjust or unreasonable unjustly discriminatory or unduly preferential individual or joint rate, or special rate, toll, fare, charge or schedule for any product or service supplied or rendered by it within this State.

'' (b)   Adopt or impose any unjust or unreasonable classification in the making or as the basis of any rate, toll, charge, fare, or schedule for any product or service rendered by it within this State.

'' (c)   Adopt, maintain, or enforce any regulation, practice or measurement which shall be unjust, unreasonable, unduly preferential, or discriminatory, nor shall any public utility as herein defined provide or maintain any service that is unsafe, improper or inadequate, or withhold or refuse any service which can reasonably be demanded and furnished when ordered by said Commission.''

It will be observed that the public policy of the State in so far as it may be ascertained from legislative dec-

laration, has been to permit unity of control subject to regulation by the State. This regulation extends to such details as approving contracts and arrangements for the consolidation of public utilities engaged in the same general business.

Chapter 87 of the Acts of 1923 enacts:

"That no public utility shall henceforth establish or begin the construction of, or thereafter operate any line, plant, or system or route in or into a municipality or other territory already receiving a like service from another public utility, or establish service therein without first having obtained from the Railroad Commission or the Railroad and Public Utilities Commission, or such other commission or board as may be invested with the general powers and duties now exercised by the Railroad and Public Utilities Commission, after written application and hearing, a certificate that the present or future public convenience and necessity require or will require such construction, establishment and operation, and no person, firm or corporation not at the time a public utility shall henceforth commence the construction of any plant, line, system or route to be operated as a public utility, or the operation of which would constitute the same, or the owner or operator, thereof, a public utility as defined by law, without having first obtained; in like manner, a similar certificate."

Section 2 of the act provides:

"That the said Commission shall not grant a certificate for a proposed route, plant, line or system or extension thereof which will be in competition with any other route, plant, line or system, unless it shall first

determine that the facilities of the existing route, plant, line or system are inadequate to meet the reasonable needs of the public or the public utility operating the same refuses or neglects or is unable to or has refused or neglected, after reasonable opportunity after notice, to make such additions and extensions thereto as may reasonably be required under the provisions of this act.''

The record shows that the recent arrangements and agreements assailed by the bill were approved and ratified by the Public Utilities Commission in conformity with section 6, chapter 49, Acts 1919. It is insisted by the appellant that the Public Utilities Commission had no authority to approve the consolidation of these companies, and that the chancellor erroneously held that the Commission could, by such approval, authorize the violation of the Anti-Trust Law of 1903, and the common law which forbids monopoly.

In determining this and the other questions presented by the assignments of error we must look to the provisions of chapter 140, Acts of 1903, enacted to prevent monopolies in the production and distribution of articles which pass through processes of barter and trade to the consuming public; and we must consider the legislative declaration relating to persons and corporations engaged in rendering service to the public. Water companies, organized to distribute water through pipes to consumers, telephone and telegraph companies which disseminate messages among the people, transportation lines such as railways and trolley lines, which carry passengers, gas companies, electric power companies, and all like concerns do not fall within the purview of the

Anti-Trust Act, chapter 140, Acts of 1903, relating to the production and distribution of articles made from domestic raw material.

It is unnecessary to discuss the question of whether or not electricity is an article of manufacture within the meaning of a taxing law, or otherwise, when we consider that it is also a power devoted to public service, and that defendants who generate and distribute it are public utilities. It is impossible to reconcile chapter 140, Acts of 1903, which forbids monopolies in articles manufactured from domestic raw material, with those statutes which authorize public utility companies to consolidate their activities under regulation by the State. These divergent lines of legislation cannot be brought together so as to bring the contracts and arrangements of the defendant public utility companies assailed by the bill within the prohibition of chapter 140, Acts of 1903.

Chapter 140, Acts of 1903, comprehends the common-law offenses of "forestalling" and "engrossing" directed against conduct that unfairly raises the price of commodities that pass in the channels of commerce to the consuming public. It does not apply to service rendered by public utilities operating under franchises held in implied trust for the benefit of the community at large, under grant from the State, subject to the power of regulation and control. The general assembly has committed to the Public Utilities Commission absolute power of regulation and control over all public utilities such as the companies involved, and, by the express and implied provisions of the statutes above referred to, any principle of the common law that might have otherwise been

invoked is superseded by these legislative declarations.

We find no error in the action of the Chancellor sustaining the two grounds of demurrer set forth above and in dismissing the bill upon the answer of the Nashville Trust Company.

Affirmed.