FRANKLIN LIGHT & POWER CO. *et al. v.* SOUTHERN CITIES POWER CO. *et al.*\*

(*Knoxville,* September Term, 1931.)

Opinion filed March 5, 1932.

---

\*As to repeal of special or local by general acts, see 25 R. C. L., 927; R. C. L. Perm. Supp., p. 5625; R. C. L. Pocket Part, title Statutes, section 177.

As to meaning given by contemporary or long professional usage, see 25 R. C. L., 1042; R. C. L. Perm. Supp., p. 5644.

Laurence B. Howard and Ed. T. Seay, for Franklin Light & Power Company.

Roy H. Beeler, Assistant Attorney-General, for R. R. & Public Utilities Commission.

Brown & Spurlock and L. N. Spears, Thos. N. Greer and J. M. Anderson, for Southern Cities Power Company.

W. J. Smith, for town of Franklin.

W. J. Towler and L. Z. Turpin, for City of Columbia.

J. L. Jones, for town of Pulaski.

Prentice Cooper, for the town of Shelbyville.

Noble L. Freemon, for City of Lawrenceburg.

Oscar Russell, for the town of Gallatin.

Park Marshall, of counsel—*amici curiae.*

Mr. Justice Chambliss delivered the opinion of the Court.

These two Companies, both incorporated under Chapter 127, Acts of 1909, providing a form of charter for water, electric light, heat and water-power companies, are contenders for the privilege of supplying electricity in and to the town of Franklin. Conceiving that the issues involved affect their rights, counsel for a number of neighboring municipalities have appeared in the case in support of the contentions of the Franklin Company and the Town of Franklin, which has by ordinance sought to confer this privilege on the Franklin Company.

Following the passage of this ordinance, and pursuant to provisions of Chapter 49 of the Acts of 1919, vesting large discretionary control of public utilities in the State Railroad and Public Utilities Commission, particularly Section 7 of that Act, which provides, "that no privilege or franchise hereafter granted to any public utility as herein defined by the State of Tennessee or by any political sub-division thereof shall be valid until approved by said Commission," the Franklin Power Company submitted to the Commission its claims under the ordinance by petition, joined by the Town of Franklin, and sought its approval.

The Southern Cities Company intervened and protested, showing that it was already located and exercising this privilege in the Town of Franklin, and had so been for some years theretofore, having entered as the approved successor of the Harpeth Electric Light & Power Company, and was prepared to furnish and was supplying the requisite and fully adequate service.

The Harpeth Company had sought and obtained from the Town of Franklin a grant by ordinance in August, 1914, which, according to its fixed term of fifteen years, would expire August, 1929, and in June, 1929, its successor, Southern Cities Company, had unsuccessfully applied to the Town for "additional franchise rights to own, operate and maintain an electric light and power system within the corporate limits," offering to agree that "the franchise applied for may be terminated any time after five years from the passage of this franchise ordinance by the town giving the Company six months' written notice," etc.; and in its protest filed on the hearing above referred to, "It admits that said franchise granted to the Harpeth Electric Light & Power Company, and transferred to this protestant expires on the 4th day of August, 1929." Chapter 127 of the Acts of 1909, under which both the Franklin Company and the Southern Company were chartered, provides:

"That said corporation after having first obtained permission from the governing authorities thereof is thereby authorized and empowered to and invested with the privilege of extending and placing its electric wires, conduits, conductors, pipes and pipe lines along, through or upon all or any of the streets, alleys or lanes of the cities, towns and villages in which it may now or hereafter operate under the provisions hereinafter provided, and in, through and along any and all of the roads, pikes and public highways of the counties, . . . ."

After a full hearing the Commission entered an order approving the franchise or privilege which the Town had elected to grant to the Franklin Company. Thereupon, the Southern Company filed its petition for *certiorari* in the Circuit Court of Davidson County showing its

prior possession of the field, its readiness and adequate equipment to supply the demand at reasonable rates fixed by the Commission, its charter and statutory privileges, and alleging that its vested rights would be invaded and destroyed by the granting of this privilege to this competitor, and that the Commission had by its order exceeded its jurisdiction and acted illegally. The effect of this insistence appears to be that (1) if a utility is now supplying service in any given municipality, it has a vested right to continue there in perpetuity, and that (2) it has by virtue of its charter powers the absolute right to enter, if not already there, without the permission of the municipalities, subject alone to the approval of the State Railroad & Public Utility Commission as to its manner of doing business.

The learned Circuit Judge sustained this petition. From his action appeal was taken to the Court of Appeals, where his judgment was reversed and the order of the Commission upheld. Petition for *certiorari* has been granted by this Court and argument heard.

The theory of the Southern Cities Company is that the Town of Franklin has no power remaining under existing law to grant or refuse a franchise or privilege to a public utility having its charter powers; that the privilege of occupying the public highways and the streets and ways of municipal corporations has been conferred on it and other like chartered companies by the State by virtue both of charter provisions and pertinent statutes, subject only to the jurisdiction of the State Railroad & Public Utilities Commission,—save perhaps for a reserved right in the municipalities to enforce reasonable police regulation of the use of their public ways.

More specifically, it is asserted (1) that by an act passed in 1909, being Chapter 151, the Charter powers

of utilities of this class were enlarged so as to confer upon them "the same rights and powers in respect to the erection and maintenance of poles and wires for the transmission of electricity for light and power purposes as are now conferred by the laws of this State upon telephone and telegraph companies,"—the insistence being that these companies had been long empowered to exercise their privileges free from municipal intervention; and (2) that particularly by the provisions of the Utilities Act of 1919, all power to grant or refuse such privileges previously exercised, pursuant to express charter provisions, by municipalities of the State has been taken from them and vested in the State Commission.

The charge of illegality in the action of the Commission, made the basis of the petition of the Southern Cities Company for *certiorari,* appears to rest on this theory, —that the Commission has not so much exceeded its jurisdiction, as that it has repudiated and refused to exercise it in recognizing the grant by ordinance of the Town of Franklin to the Franklin Power Company of the electric light and power privilege, and giving its approval thereto in the face of the view advanced by the Southern Company that the Town is now without such power.

For the Town of Franklin, it is said, first, that by the express terms of the Special Act of 1903 granting its charter it was empowered, "to grant the right of way over streets, alleys, avenues, squares and other public places of said town for the purposes of street railroads, or other railroads, telephones, telegraphs, gas pipes, electric lines and such other purposes as the Board may deem proper; provided that they shall not grant the exclusive right . . . to any person, company or corporation for more than twenty years," and that no gen-

eral law will be construed by implication to repeal this special enactment.

Second, that the Utility Act of 1919 does not purport, as insisted, to denude this or like empowered municipalities of this right of local control, but that, on the contrary, it is directed to matters of regulation of rates and service, operation and consolidation of these utilities as and where they may be in operation, without jurisdiction over the granting, either of charter powers generally, or special location privileges in subdivisions of the State, and that this expressly appears from the language of Section 7 of the Act referring to franchises or privileges hereafter granted to any public utility by any sub-divisions of the State.

Issues of procedure are presented and discussed on the briefs, questioning the right of the Southern Company to appear and contest at all in this proceeding, because without substantial interest, asserting that it has other remedies if and when its rights are impinged, and denying its right to proceed by *certiorari* in the Circuit Court. However, we have resolved any doubts on these questions of procedure in favor of the petitioner here, and, adopting the conclusions of the Court of Appeals touching these issues, proceed to a consideration of the merits.

In the first place, it must be conceded that Southern Cities Company is met on the one hand by an express charter power in the municipality, and on the other is burdened by an express limitation in its own charter provided for by Chapter 127 of the Acts of 1909, which reads as follows:

"That said corporation *after having first obtained permission from the governing authorities thereof* is thereby

authorized and empowered to and invested with the privileges of extending and placing its electric wires, conduits," etc., etc., "along, through or upon all or any of the streets, alleys or lanes of cities, towns and villages in which it may now or hereafter operate," etc.

Looking to the language we have above italicized, in the charter of the Southern Cities Company, and coupling these words of limitation with the language of the charter of the Town expressly conferring the power to "grant the right of way over streets, alleys," etc., to such public service corporations, no room for doubt would seem to remain. And it may be remarked, in passing, that it was with this situation in mind, no doubt, that the representatives of the Southern Cities Company sought to obtain from the Town in June, 1929, a grant of an extension of this privilege for an additional five years. While this action may hardly be given the force of an estoppel, as argued, it is significant as indicative of the view up to that time entertained by the representatives of the Southern Cities Company, in common with others quite generally, in respect to the mutual rights of this class of utilities and municipalities with like charter provisions.

Meeting this apparent bar to its present contention, petitioner, as already suggested, insists (1) that Chapter 151 of the Acts of 1909, amended or repealed this grant on the one hand, and limitation on the other, in the respective charters; and (2) that the general utilities Act of 1919 transferred from the municipalities to the Commission this prerogative. We are not of opinion that either contention can be sustained.

*The effect of Chapter* 151, *Acts of* 1909. We understand it to be conceded that until the passage of this

Act utilities of the class under consideration were obligated to procure permissive grants from municipal authorities for doing business within their limits. The Charter Act of 1895, Chapter 208, did not contain, as did the Charter Act of 1909, Chapter 127, an express recognition of this obligation. The laws of the State applicable to telephone and telegraph companies, at that time in effect, specifically the Act of 1885, Chapter 66, contained no such express recognition, but a claim for this class of utilities of more independent rights in this regard is rested on this lack, and on the through-State, rather than local nature of their business. The Act of 1909, with its caption, reads as follows:

"AN ACT to declare the powers and rights of water and electric-light, heat and power companies created under the laws of this State.

"SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE, That water and electric light, heat and power companies created under the laws of this State, whether operated by steam or water power, shall have and exercise the same rights and powers in respect to the erection and maintenance of poles and wires for the transmission of electricity for light and power purposes as are now conferred by the laws of this State upon telephone and telegraph companies for the transmission of telephone and telegraph messages."

It has been plausibly urged by counsel for the Franklin Power Company that if this Act may be construed to apply to Companies chartered under Chapter 208, Acts of 1895, it cannot have application to those like the Southern Cities Company chartered under Chapter 127 of the Act of 1909, because (1) of the difference in the names or styling of these charter acts,—this difference

consisting in the use of a comma, instead of the word "and" between the words "water" and "electric," and the use of the word "water-," followed by a hyphen before the word "power;" also, because, (2), since Chapter 127 of the Acts of 1909 had not become a law when Chapter 151 was introduced a day later, it could not be taken to have been intended to refer to it. However, in the view we take, it is not necessary to consider these insistencies.

It is to be observed that Chapter 151 of the Acts of 1909 confers upon water and electric light, heat and power companies "the same rights and powers . . . as are now conferred by the laws of this State upon telephone & telegraph companies," in respect "to the erection and maintenance of poles and wires for the transmission," etc. Now, looking to "the laws of this State" conferring powers on telephone and telegraph companies in this respect, and conceding that the intent was to amend the charter powers of "water and electric light, heat and water power companies" organized under Chapter 127 of the Acts of 1909, as well as those organized under Chapter 208 of the Acts of 1895, it will be seen that telephone and telegraph companies had powers of eminent domain conferred upon them by Chapter 66 of the Acts of 1885 in respect to the erection and maintenance of their transmission lines far more extensive than those conferred on companies chartered under either Chapter 208 of the Acts of 1895 or Chapter 127 of the Acts of 1909. Telephone and telegraph companies were empowered to erect and maintain their poles and wires, not only along public ways and over private property, to which alone the rights and powers of water and electric light companies extended, but also along turnpike rights of way, and under and over streams, and

upon and over bridges and structures of railroads, and along their rights of way, and enjoyed powers of condemnation for these purposes, and also over publicly owned property. Also, by Section 3 of the Act of 1885, the right of peaceful entry upon all such properties for purposes of survey, etc., was expressly conferred,—a right not conferred upon water and electric light companies.

It is apparent that these privileges were of great importance and perhaps equally to be desired by State-wide or through-State electric light companies as by telephone and telegraph companies, by whom, until the passage of Chapter 151 of the Acts of 1909, the privilege of erecting and maintaining poles and wires for transmission purposes along the rights of way of railroad companies and turnpike companies, then privately owned, were exercised exclusively. No power had been conferred prior to the passage of the Act of 1909 on electric light companies to acquire these rights on and over the property of these *quasi*-public corporations, already devoted to a public use, and no right of condemnation of such properties was recognized unless expressly conferred by legislative enactment. Nor had the right been up to that time conferred on electric light companies to occupy "the lands or public works belonging to the State," as was true of telephone and telegraph companies. These were "rights and powers" peculiarly "in respect to the erection and maintenance of poles and wires for the transmission" purposes of these companies.

It may well be taken to have been the purpose of Chapter 151 of the Acts of 1909 to confer these important and needed rights and powers on electric light and power companies, whether chartered under the Act of 1895, or under the Acts of 1909, but it need not and can-

not be construed to have been the intention of the legislature by this general act to strike down, by implication merely, the powers expressly conferred upon the municipalities of the State by their charters, and expressly reserved to them in the charter Act of 1909 providing for the organization of water, electric light, heat and water-power companies,—therein made a condition of their occupation of these subdivisions of the State, "for the purpose of supplying water, electricity," etc., "to the inhabitants thereof."

It is in Section 5 of Chapter 127 of the Acts of 1909 that such limited powers of condemnation as are now conferred under that Act are set forth, that section dealing with rights of way "between its ponds, dams," etc., and "the cities, towns and villages and other points at which" the power is to be used, and conferring condemnation powers as to private lands only; whereas, it is in Section 3 that the right of entry into and operation in cities, towns, etc., is dealt with, wherein the requirement twice appears that the permission of the governing authorities must be first obtained. We are of opinion that it is to Section 5, aforesaid, that Chapter 151 is to be related, with the effect of greatly enlarging the powers and rights of electric light and power companies with particular reference to condemnation, rather than to Section 3, which deals with the occupation of the streets of municipalities for the purpose of supplying the inhabitants thereof.

This view is strengthened by the restrictive language of Chapter 151 already noted, confining its objective to the erection and maintenance of poles and wires for transmission purposes. This language does not suggest a purpose to deal with, enlarge or affect, rights and powers in respect to operation in a given territory, the

supplying of the inhabitants thereof, so much as transmission from plant, or place of production, to point of use or consumption. This distinction between the right to erect and maintain poles and wires for transmission purposes from point to point, and the right to occupy and operate for distribution purposes in a given territory, had recently before the passage of this Act of 1909 been discussed and emphasized by Mr. Justice WILKES in his opinion in *Telegraph Company* v. *Nashville,* 118 Tenn., at pages 16, *et sequi.* With this distinction in mind between these respective rights and powers, the inference is natural that it was this transmission right to which this legislation was directed, as its language plainly imports.

By this construction repugnancy and conflict are avoided and Chapter 151 is given substantial effect as a general law, without violation of recognized rules of construction under which special acts are not treated as repealed, or amended as to matters of conflict, by general enactments. Upon this point, we quote as follows from the able opinion of the Court of Appeals, speaking through Judge DeWITT:

"It is another canon of construction that when the provisions of a general law, applicable to the entire state, are repugnant to the provisions of a previously enacted special law, applicable in a particular locality only, the passage of such general law does not operate to modify or repeal the special law, unless such modification or repeal is declared by express words, or arises by necessary implication. 36 Cyc., 1090; 25 R. C. L., 927. The intention to repeal must clearly appear. *Vertrees* v. *State Board,* 141 Tenn., 654, 214 S. W., 737; *Camden Fire Insurance Ass'n* v. *Haston,* 153 Tenn., 675, 284 S. W., 905. This principle, *generalia specialibus non derogant,*

is especially applicable to cases where general statutes are argued to overrule the provisions of special charters granted to municipal corporations, or special acts passed for their benefit. 36 Cyc., 1091. In *Burnett* v. *Maloney,* 97 Tenn., 697, 37 S. W., 689, the statement of this rule in Black on Interpretation of Statutes, sec. 223, was quoted with approval as follows:—

" 'It has come to be an established rule, in the construction of statutes, that a subsequent act treating a subject in general terms, and not expressly interdicting the provisions of a prior special statute, is not to be considered as intended to affect the more particular and specific provisions of the earlier act, unless it is absolutely necessary so to construe it in order to give its words any meaning at all.' "

Moreover, it will be seen that said Chapter 151 refers only to those rights and powers "now conferred by the laws of this State upon Telephone & Telegraph Companies," etc. The phrase "the laws of this State" has apparent application to the statute laws, and these laws do not expressly empower telephone and telegraph companies to occupy at will the territory of municipalities with the power reserved in their charters to grant the privilege. The Act of 1885 contains no such express authority. And as shown by the Court of Appeals, reviewing the pertinent decisions of this Court, "the question is open for determination whether or not the Act of 1885 should be read and applied with due reference to limitations imposed by municipal charters." These considerations strengthen our conclusion not to give this Act of 1909 a construction which would denude these municipalities of the powers expressly conferred on them.

The view we adopt of the effect of Chapter 151, Acts of 1909, harmonizes the legislation and permits both

classes to stand. And it is in harmony also with the general trend and import of legislation on this subject, consistent not only with existing municipal charters, but many subsequently granted by later acts,—for it appears that following the enactment of Chapter 151, Acts of 1909, the General Assembly continued to grant to municipalities charters with the power to grant these franchises or privileges to public service corporations, and never throughout the twenty years following have these powers so conferred been questioned until now.

This general statement from 25 R. C. L., page 1041, approved in *Hunter* v. *Harrison,* 154 Tenn., at page 598, is applicable here:

"Legislative policy clearly deducible from the consistent legislation of Congress or a state legislature is a legitimate factor in determining the meaning of subsequent acts open to a construction, and such policy is not to be regarded as abandoned further than the terms and objects of the new legislation unmistakably require."

And, again, on page 1042 of 25 R. C. L., it is said:

"The meaning publicly given by contemporary or long professional usage is usually presumed to be the true one, even when the language has etymologically or popularly a different meaning. If there is ambiguity in the language, the understanding and application of it when the statute first comes into operation, sanctioned by long acquiescence on the part of the legislature and judicial tribunals, are the strongest evidence that it has been rightly explained in practice."

*State ex rel.* v. *Baseball Club,* 127 Tenn., 292, is among the cases cited. Therein it was said:

"A construction of a statute or the constitution, not emanating from judicial decision, but adopted by the

legislative or executive departments of the State, and long accepted by the various agencies of government and the people, will usually be accepted as correct by the courts. *Richardson* v. *Young,* 122 Tenn., 471, 125 S. W., 664; *Kelly* v. *State,* 123 Tenn., 516, 132 S. W., 193; *Brown* v. *Sullivan County,* 126 Tenn., 689, 151 S. W., 50; *Martin* v. *Hunter's Lessee,* 1 Wheat., 304, 4 L. Ed., 97; *Stuart* v. *Laird,* 1 Cranch, 299, 2 L. Ed., 115; *Cohens* v. *Virginia,* 6 Wheat., 264, 5 L. Ed., 257; *Bank of U. S.* v. *Halstead,* 10 Wheat., 51, 6 L. Ed., 264; *Minor* v. *Happersett,* 21 Wall., 162, 22 L. Ed., 627; Cooley's Const. Lim. (7 Ed.), 103, 104.''

It is hardly to be conceived that, if the intent of the legislature in the passage of Chapter 151 of the Act of 1909 was to revoke or annul the franchise or privilege granting power conferred so generally by the charters of municipalities, the policy of the legislature in this regard would have been uniformly continued thereafter. For example, a significant illustration, one of many, of this continuing legislative policy, as well as legislative construction of both Chapter 151 of the Acts of 1909 and the Utilities Act of 1919, is to be found in the Act passed as late as April, 1929, granting practically a new charter to the town of Lebanon. This power clause, common, in substance, to municipal charters generally in Tennessee, appears therein (Sub-sec. 15 of Art. II):

''To grant to any person, firm, association or corporation, franchise for public utilities and public services to be furnished to the City and the inhabitants thereof. Such power to grant franchises shall embrace the power hereby expressly conferred to grant exclusive franchises, and whenever an exclusive franchise is granted, it shall be exclusive only as against any other person, firm, association or corporation, but not against the City itself.

Franchises may be granted for the period of twenty years or less, but not longer, subject to conditions hereinafter provided.''

 *The effect of the Utilities Act of 1919.* This brings us to the consideration of the insistence to which the last filed brief for petitioner in this Court is chiefly directed, namely, that these powers of the Town of Franklin, and like chartered municipalities, were abrogated, or transferred to the State Railroad & Public Utility Commission, by the act of 1919. It has been seen that no such effect is recognized by the Commission itself, and, again, it is only now, for the first time after ten years since the enactment, that such a claim has been advanced by the utilities themselves. And, as before noted, on the contrary,—suggestive of a sort of analogy to the rule of practical construction by the interested parties to contracts,—so late as June, 1929, the petitioner itself made an application to the Town of Franklin in direct recognition of the powers it now denies.

Much reliance is placed on language used by Mr. Justice Cook in the course of his opinion in *State ex rel.* v. *Nashville Ry. & Light Co.,* 151 Tenn., 77, holding the Anti-Trust Act inapplicable to public utility Companies in view of the provisions of the Act of 1919 vesting broad powers in the State Commission. His use of the term ''absolute power'' as committed by that Act to the State Commission is much stressed, but this and like language in that opinion must be taken in its context. His language was ''absolute power of *regulation and control* over all public utilities.'' He was discussing and emphasizing the ''general supervision and regulation'' conferred on the Commission over their leases, sales and consolidations, their rates and services, and operations

generally,—the *exercise* by them of their property rights, facilities and franchises,—not the granting to them thereof by the State or its sub-divisions. There is no suggestion in this opinion, as there is none in the Act itself, that the State had denuded itself or its municipal subdivisions of the elemental power to grant the right to these corporations to do business in the State at large, or in these sub-divisions thereof. In this connection, it is well to quote from Section 3 of the Act, defining, under the side heading, "Jurisdiction and Control," the powers of the Commission, as follows: "Be it further enacted, That the Railroad & Public Utilities Commission of the State of Tennessee shall have general supervision and regulation of, jurisdiction and control over all public utilities, and also over their property, property rights, facilities and franchises, *so far as may be necessary for the purpose of carrying out the provisions of this Act.*" The limiting language we have italicized is to be noted, and the details of the regulatory powers conferred on the Commission are specified in succeeding sections, there being nowhere included or conferred the power to grant to a public utility the privilege of entering upon the territory of a municipality and there conducting its business without the consent of the municipality.

While it is said in *Malone* v. *Williams,* 118 Tenn., 445, "nor is there any doubt under our decisions that, where a subsequent act contains a full scheme of legislation upon the subject which it covers, it operates as a repeal of prior acts on the same subject (*Erwin* v. *State,* 116 Tenn., 71, 89, 90 *et seq.*)," the Court was discussing charter powers of the City of Memphis, and the Erwin case cited dealt with an act which purported to provide a form of government for the municipality, and it appearing clearly to cover the entire subject, the Court

held it to repeal a former act on the same subject. There is no controlling analogy between this line of cases and that now before us. The general Utility Act of 1919 does not purport to deal with the rights or powers of the Town of Franklin, or with the charter powers of municipalities at all. In so far as it embraces legislation on the subject of privileges and rights of municipalities, it expressly recognizes the continuing existence of these rights by references thereto in Sections 3 and 7, as elsewhere observed. In order for application to be given the rule referred to in *Malone* v. *Williams,* above quoted, the subsequent Act must appear to enact a complete scheme of legislation touching the matters embraced in the former Act, in that case municipal organization, privileges and powers. The main subject of the Act of 1919 is that of control of utilities, and municipal charter rights are touched on, if at all, only incidentally and inferentially, that is, by implication.

Not only is this power reserved in municipalities recognized by language hereinbefore quoted from section 7 of the Act referring to privileges or franchises which might be thereafter granted to any public utility, but like language is found in Section 3 referring to "privileges, franchises, licenses, or agreements, heretofore granted, or hereafter to be granted, by the State of Tennessee or by any political sub-division thereof." These public utilities must still obtain from the State their elemental powers to conduct their business, and from the municipal subdivisions vested with charter powers over their respective territory the privilege of entering and doing business therein.

Much has been well said on the briefs for petitioner of the advantages to accrue from a policy of centralized

State control of public utilities, in independence of rights and powers of local communities, under modern conditions and to meet modern demands on the part of the public. On the other hand, counsel for the municipalities have strongly emphasized the rights of local government. These are matters of policy which are for the general assembly, rather than the Courts, whose duty alone it is to construe and declare the law as it is found.

It appearing to us to be clear that thus far the legislative policy of the State has been to reserve to its municipal sub-divisions the privileges under consideration, it results that the judgment of the Court of Appeals must be affirmed.